IN THE UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF WISCONSIN

PETER BERNEGGER,

    Plaintiff,

v.

BRANDON KAISER, individually;
DAVID M. ERWIN, individually;
JED D. ROFFERS, individually;
MEAGAN WOLFE, individually;
BEN SCHMIDT, individually; and
JOHN/JANE DOES 1–10, individually,

    Defendants.

U.S. District Court
Wisconsin Eastern

MAY 19 2026

FILED
Clerk of Court

Case No. 1:26-cv-00551-BBC

**FIRST AMENDED COMPLAINT**

JURY TRIAL DEMANDED

1. Plaintiff Peter Bernegger files this First Amended Complaint against the persons sued above, alleges as follows:

## I. NATURE OF THE ACTION

2. This is a civil-rights action under 42 U.S.C. § 1983 seeking nominal damages, compensatory damages, punitive damages, and declaratory relief against Defendants in their individual capacities only.

3. This action arises from a coordinated misuse of law-enforcement authority and official records to retaliate against a citizen who publicly criticized a state election official, sought public records concerning that official's conduct, and attempted to obtain that official's sworn deposition testimony in pending Wisconsin litigation.

Case 1:26-cv-00551-BBC    Filed 05/19/26    Page 1 of 67    Document 23

4. Plaintiff states Defendants caused a legally unauthorized "Warning Letter" to be drafted on Wisconsin State Capitol Police letterhead and served by armed law-enforcement officers at Plaintiff's home on July 7, 2023.

5. Defendants then created additional false or materially misleading official records describing that letter as a "harassment order" and a "stalking warning letter".

6. Defendants then introduced those records into Plaintiff's pending Wisconsin public-records mandamus action (Waupaca County Circuit Court Case No. 23-CV-0046) in order to obstruct Plaintiff's court-ordered effort to depose Defendant Meagan Wolfe.

7. Plaintiff states Defendant Meagan Wolfe acted ultra vires by maintaining and promoting use of the National Mail Voter Registration Form as a prescribed Wisconsin voter-registration form, without lawful Commission action, thereby causing the dilution of Plaintiff's lawful vote in Wisconsin elections in which he voted, including the November 3, 2020 general election.

## II. JURISDICTION AND VENUE

8. This Court has subject-matter jurisdiction under 28 U.S.C. § 1331 (federal question) and 28 U.S.C. § 1343(a)(3) and (4) (civil-rights jurisdiction).

9. This action was originally filed in Waupaca County Circuit Court on March 10, 2026, and was removed to this Court by the State Defendants pursuant to 28 U.S.C. §§ 1441 and 1446.

10. The case is now docketed as Case No. 1:26-cv-00551-BBC.

11. Venue is proper in the Eastern District of Wisconsin under 28 U.S.C. § 1391(b) and 28 U.S.C. § 1441(a) because the case was removed from a state court located within this district and because a substantial part of the events or omissions giving rise to the claims occurred in this district.

12. Each Defendant is sued in his or her individual capacity for acts taken under color of state law.

13. The principal events giving rise to this action occurred on or about July 7, 2023, when the Warning Letter was served and the related police incident report was created, and continued through August 2023 and beyond, when false or materially misleading sworn affidavits were filed in Case No. 23-CV-0046.

14. This action was filed within the three-year limitations period applicable to 42 U.S.C. § 1983 claims in Wisconsin under Wis. Stat. § 893.54.

15. As to the 42 U.S.C. § 1986 claim, Plaintiff alleges a continuing violation.

16. The Warning Letter has never been withdrawn, rescinded, modified, or disavowed and remains in effect as an operative law-enforcement record as of the date of this Amended Complaint.

17. Plaintiff's § 1986 claim is timely as to all Defendants who, within one year of the original filing, continued to possess authority to cause the letter to be withdrawn, corrected, or disavowed and who have not done so.

18. In the alternative, Plaintiff alleges equitable tolling because Defendants' coordinated mischaracterization of the Warning Letter in official records and sworn filings concealed the pretextual and unlawful nature of their conduct.

### III. PARTIES

19. Plaintiff Peter Bernegger is an adult citizen and resident of the State of Wisconsin residing at 1806 Brynnwood Trace, New London, Wisconsin 54961.

20. He is an elector and votes consistently.

21. Defendant Brandon Kaiser was, at all times relevant, an officer of the Wisconsin State Capitol Police whose office address is 17 West Main Street, Room 301, Madison, Wisconsin 53703.

22. Kaiser drafted, approved, or caused the Warning Letter to be drafted on Capitol Police letterhead and caused it to be served on Plaintiff through law-enforcement personnel.

23. Kaiser is sued in his individual capacity.

24. Defendant David M. Erwin was, at all times relevant, the Chief of the Wisconsin State Capitol Police, with command, approval, ratification, training, and policy authority over Capitol Police actions of the kind alleged herein, including the issuance of warning letters and investigative directives purporting to govern citizen contact with state offices.

25. His office address is 17 West Main Street, Room 301, Madison, Wisconsin 53703.

26. Erwin is sued in his individual capacity.

27. Defendant Jed D. Roffers was, at all times relevant, a Special Agent with the Wisconsin Department of Justice, Division of Criminal Investigation ("DCI"), operationally assigned to the DCI Appleton field office in Outagamie County, Wisconsin.

28. Roffers personally served the Warning Letter at Plaintiff's residence on July 7, 2023, and later submitted sworn affidavits used in Case No. 23-CV-0046.

29. Roffers is sued in his individual capacity.

30. Defendant Roffers, at all times relevant, resided at 1567 Meadow Heights Circle, Neenah, Wisconsin 54956, located in Winnebago County, as confirmed by county property tax records.

31. Defendant Roffers's primary physical work office during the relevant period was the DCI Fox Valley regional field office in Appleton, Wisconsin, located in Outagamie County.

32. The office address is 3012 E Capital Drive, Appleton, Wisconsin 54911.

33. Defendant Roffers did not physically report for duty in Dane County.

34. Defendant Roffers's DCI chain of supervision during the relevant period included Special Agent in Charge Marshall Ogren and Special Agent in Charge Jeffrey Wisch of the DCI Appleton field office.

35. On information and belief, Defendant Roffers is no longer employed by the Wisconsin Division of Criminal Investigation as of in or before April 2026.

36. Defendant Meagan Wolfe was, at all times relevant, the Administrator of the Wisconsin Elections Commission ("WEC"), with offices at 201 West Washington Avenue, Second Floor, Madison, Wisconsin 53703.

37. Wolfe was the public official whose sworn deposition Plaintiff sought in Case No. 23-CV-0046.

38. Wolfe is sued in her individual capacity.

39. Defendant Ben Schmidt was, at all times relevant, a law-enforcement officer with the New London Police Department, 700 Shiocton Street, New London, Wisconsin 54961.

40. Schmidt accompanied Roffers to Plaintiff's residence on July 7, 2023, and thereafter authored or caused the creation of an official incident report describing the served document as a "harassment order." Schmidt is sued in his individual capacity.

41. Defendants John/Jane Does 1–10 are persons whose identities are presently unknown who participated in, authorized, directed, assisted, ratified, concealed, or furthered the acts alleged herein.

42. Each Doe Defendant is sued in his or her individual capacity.

43. Plaintiff will move to substitute true names upon learning their identities through discovery.

44. At all times relevant, each Defendant acted under color of state law within the meaning of 42 U.S.C. § 1983.

45. Each Defendant is sued solely in his or her individual capacity. Plaintiff does not sue any Defendant in official capacity, does not sue any state agency, municipal entity, public office, current officeholder, successor, or records custodian, and does not seek relief requiring any

nonparty agency, officeholder, successor, or governmental records custodian to correct, expunge, withdraw, annotate, or disavow official records. Plaintiff seeks nominal damages, compensatory damages, punitive damages, costs and fees to the extent permitted by law, and retrospective declaratory relief against Defendants individually.

46. Defendants in this action are not employees of a single juridical entity. Defendant Wolfe is an employee of the Wisconsin Elections Commission, a bipartisan agency established under Wis. Stat. § 5.05 and distinct from the Wisconsin Department of Justice. Defendants Kaiser and Erwin are employees of the Wisconsin State Capitol Police, a division of the Wisconsin Department of Administration, distinct from both WEC and DOJ. Defendant Roffers is an employee of the Wisconsin Department of Justice, Division of Criminal Investigation, or at least was until recently. Defendant Schmidt is an employee of the City of New London, Wisconsin, Police Department - a municipal entity distinct from all three state agencies.

## IV. FACTUAL ALLEGATIONS

### A. Plaintiff's Protected Activities

47. Beginning in or before 2023, Plaintiff filed and pursued a public-records mandamus action against the Wisconsin Elections Commission in Waupaca County Circuit Court, Case No. 23-CV-0046, seeking production of public records (including emails and text messages relating to Wolfe and other WEC personnel) and seeking enforcement of Wisconsin's public-records law.

48. In that action, Plaintiff noticed or sought the sworn deposition of Meagan Wolfe because she was a central fact witness regarding the existence, custody, retention, withholding, and contents of the requested records, and because her testimony would supply admissible evidence for use in summary judgment and at any hearing or trial on the merits.

49. Plaintiff also engaged in extensive public criticism of Wolfe and WEC concerning alleged election-administration misconduct, including criticism published through widely accessible social-media channels and online publications that on multiple occasions reached audiences numbering in the hundreds of thousands and, at times, more than one million views.

50. Plaintiff's criticism included a call for Wolfe's resignation and for her prosecution in connection with alleged unlawful election-administration conduct, including the unauthorized use of the National Mail Voter Registration Form.

51. A Waukesha County circuit court (Hon. Maxwell) directly named Wolfe twice in connection with violations of election laws concerning the unlawful use of federal registration forms.

52. See *Braun v. Wisconsin Elections Commission,* attached as Exhibit G.

53. On May 15, 2023, before the July 7, 2023 Warning Letter, Plaintiff sent a written communication to Defendant Wolfe and WEC directly accusing Wolfe and WEC of defaming him, of spreading a false armed-violence narrative about him, and of unlawfully administering or processing National Mail Voter Registration Form registrations. A true and correct copy of that May 15, 2023 communication is attached as Exhibit I.

54. In that May 15, 2023 communication, Plaintiff specifically challenged Wolfe's alleged use of a Madison post-office-box pathway and asked whether Wolfe had told the six WEC Commissioners that approximately 250,000 paper voter-registration applications had been processed through that pathway, even though Plaintiff asserted that Wisconsin law placed voter-registration processing authority with municipal clerks.

55. The May 15, 2023 communication was protected speech and petitioning activity concerning matters of public concern, election administration, public records, Plaintiff's own reputation, Plaintiff's company, and Plaintiff's status as a Wisconsin elector.

56. Wolfe communicated with, met with, exchanged emails with, a non-profit named Civitech based in Austin, Texas. One of their addresses is 1023 Springdale Rd, Austin, TX 78721.

57. Wolfe communicated with, met with, exchanged emails with, a non-profit named The Center For Voter Information (CVI). They are located in Washington DC.

58. CVI, Civitech and Wolfe conspired a scheme to have about 1 million unlawful voter registration forms sent out to people in Wisconsin.

59. Wolfe participated in several meetings with Civitech, CVI, to achieve the mailing via the US Postal Service of these unlawful voter registration forms to Wisconsin people.

60. Wolfe, Civictech, CVI used a hidden, bulk mail receiving PO Box in Madison, WI to receive the filled in, unlawful by Waukesha County State Circuit Court order, registration forms from unsuspecting Wisconsin people.

61. Wolfe directed or had Wisconsin Election Commission (WEC) staff employees process some or all of these unlawful voter registration forms. It is against Wisconsin state election law for WEC, their staff, or any other people or entity to process voter registration forms in paper format except for designated election clerks, primarily municipal clerks but some county clerks also. Wolfe knew this yet proceeded to process these paper voter registration forms. Forms which were unlawful to use in Wisconsin per Judge Maxwell's court order, and per Wisconsin State Election law. Wis. Stats. 6.33(1), (2),(5).

62. A whistleblower has put in writing to Plaintiff the number of these unlawful forms filled out by Wisconsin people then processed by Wolfe, her staff and/or others, were about 250,000.

63. This was during, approximately the 9 months before the 2020 General Election.

64. But also in prior years when Wolfe began her job as Administrator of WEC in June of 2016.

65. Wolfe continued to direct, participate in, having the unlawful voter registration forms sent out to people in Wisconsin after the 2020 election.

66. Those approximately 250,000 people are unlawfully registered.

67. Those approximately 250,000 registrants are still registered as ACTIVE, meaning electors, as of today. Some of these unlawfully registered people are casting ballots in Wisconsin elections; still to this day; and some will be in the 2026 mid-term elections and future elections.

68. Wolfe did not inform the six WEC Commissioners the voter registration form she used was unlawful, illegal, to use in Wisconsin. Wolfe hid this information from the WEC Commission.

69. The unlawful form was missing about 11 key questions the person using it to register to vote did not have to answer. It violated Wis. Stats. 6.33 et. al.

70. This is compared to the legal, officially sanctioned voter registration form the State of Wisconsin had approved for use in registering.

71. Wolfe knew the six Commissioners had not voted to approve the use of the unlawful voter registration form she worked to be sent out to the approximately 1 million people in Wisconsin.

72. She knew the form she, along with Civictech, with CVI, and others, were sending out to these people was not an officially approved Wisconsin form.

73. She knew it did not have the required Wisconsin form number, date edition, printed in the lower left hand corner of the unlawful form.

74. CVI used a UPS store rental PO Box as an address. Making it look like it was a real physical address for them when it was not. The address was 1360 Regent St. #199, Madison, WI 53715. CVI however is based in Washington D.C.. CVI also used the misleading address on their mailings

to people in Wisconsin of 601 Sawyer Ter #5528, Madison, WI 53705-6022. This address is a federal government US Post Office location in Madison.

75. A 2024 City of Evansville, Wisconsin press release specifically stated that "CiviTech and Center for Voter Information" were using outdated mailing lists to send voter-registration applications to deceased individuals.

76. Center For Voter Information's (CVI) 2023 IRS Form 990 lists "CIVITECH PBC" as one of the Center's five highest-paid independent contractors, paid $120,161 for "DATA PROGRAM SERVICES."

77. WEC Administrator Wolfe said it was legal for a political group, such as CVI to mail absentee ballot applications to Wisconsin voters. "Political and independent groups may legally send out voter registration forms and absentee ballot request forms to encourage voting, Wolfe said. This was a continuation of the conspiracy to use the unlawful voter registration forms, as Wolfe was responding to the challenge of the unlawful registration forms. She knew those forms, nor the instructions, were lawful. Wolfe knew the six WEC Commissioners never voted to approve the unlawful voter registration form. She knew the six WEC Commissioners never voted to approve the accompanying instructions.

78. Wolfe and the others knew WEC had never prescribed the unlawful Form as required by Wis. Stat. § 6.33. Wolfe intentionally used the unlawful form.

79. In WEC's March 26, 2020 press release, WEC Administrator Wolfe said, "Political and independent groups may legally send out voter registration forms and absentee ballot request forms to encourage voting." Wolf's statement that it is legal for groups to mail absentee ballot applications to voters was not true. Wis. Stat. §§ 6.869 and 6.86(2)(a) require WEC to prescribe the absentee ballot applications and instructions and provide the forms to municipal clerks who

then distribute the absentee ballot applications and instructions to the electors after the electors request them. Wolfe knew the instructions were unlawful, yet intentionally proceeded to work to send them out, have them filled out and returned by people in Wisconsin, and get them into the WisVote voter registration database system where upon those people could cast ballots.

80. Wolfe and the others, including CVI and Civitech, took steps to have the some 1 million unlawful voter registration applications be sent to political left leaning, Democrat, people in Wisconsin. They planned it to be this way. They knew many, most if not all, unlawful registration forms being sent out were targeting Democrats; excluding conservatives, Republican, leaning people in the state. This was intentional, fraudulent acts, by Wolfe and the others.

81. Because the unlawful form omitted mandatory Wisconsin screening, proof-of-residence, clerk-recordation, felony-status, residency-duration, and disqualification safeguards required by Wis. Stat. § 6.33, registrations entered through that pathway were not merely procedurally irregular; they bypassed statutory conditions Wisconsin made mandatory before a person could be placed on the active voter rolls and have a ballot counted in Wisconsin elections.

82. Plaintiff's activities, speaking about a public official, publishing criticism, seeking public records, petitioning the government, pursuing civil litigation, taking discovery, preparing evidence for dispositive motion practice, and associating with public officials and witnesses for lawful purposes, are protected by the First Amendment's Free Speech, Free Press, and Petition Clauses, as incorporated through the Fourteenth Amendment.

**B. The Warning Letter**

83. Prior to July 7, 2023, a written communication on Wisconsin State Capitol Police letterhead (the "Warning Letter"), a true and correct copy of which is attached as Exhibit A, was drafted and directed to Plaintiff at his home address.

84. The Warning Letter purported to address Plaintiff's conduct toward "Meagan Wolfe and others at the Wisconsin Election Commission." (Ex. A.)

85. The Warning Letter was not a court order.

86. It was not signed by a judge, bore no case caption, contained no court file number, was not preceded by any hearing, and was not issued in any pending criminal case.

87. No court or judicial officer authorized it.

88. No statutory enforcement mechanism authorized the Capitol Police or DCI to impose the communication restrictions it contained.

89. The Warning Letter did not identify the supposedly protected persons beyond Wolfe; did not specify any concrete act, communication, date, location, recipient, or course of conduct attributed to Plaintiff; did not identify any complainant statement; cited no witness, surveillance record, or supporting documentation; and provided no example of the conduct it purported to address. (Ex. A.)

90. The Warning Letter instructed Plaintiff that any communications with WEC personnel were to be made "pursuant to and as provided by law, including Wis. Stat. § 802.05(2)," a civil procedure rule that governs attorney and party representations to courts and that confers no police authority to regulate a citizen's communications with government officials or agencies.

91. The Warning Letter referenced unspecified administrative code provisions but cited none. (Ex. A.)

92. The Warning Letter commanded Plaintiff: "in no event are you to have contact by any means in any way other than during regular business hours."

93. The Warning Letter further stated as a closing line: "Please consider this a formal warning that any future stalking behavior for which you are responsible could result in arrest by law enforcement and prosecution."

94. The Warning Letter cited Wis. Stat. § 940.32, Wisconsin's stalking statute, as the legal basis for that characterization. (Ex. A.)

95. Defendants had no probable cause, arguable probable cause, or reasonable factual basis to believe Plaintiff's conduct satisfied any element of Wis. Stat. § 940.32.

96. The Warning Letter identified no course of conduct, no alleged victim statement of serious emotional distress or fear of bodily injury, no witness, and no documentation.

97. The Warning Letter was issued on Wisconsin State Capitol Police letterhead, bears Chief David M. Erwin's printed name immediately beneath the Capitol Police header, and contains a DCI signature block.

98. The face of the Warning Letter further routes copies to Capitol Police headquarters at 17 West Main Street, Madison, while it was served by a DCI Special Agent. (Ex. A).

99. That distribution and signature configuration confirms on the face of the document that DCI and Capitol Police were acting in coordination on its creation and service.

100. Capitol Police never interviewed Plaintiff before issuing the Warning Letter.

101. Plaintiff was afforded no notice, no hearing, no opportunity to be heard before issuance, and no administrative mechanism by which he could seek the letter's withdrawal or judicial review of the restrictions it purported to impose. There was no court case.

102. Defendant Kaiser drafted, approved, or caused the Warning Letter to be issued.

103. Defendant Erwin participated in drafting, reviewing, and approving the Warning Letter, directed Kaiser to write it, proofread it before it was sent, and approved its issuance on his command's letterhead.

104. Erwin retained authority to withdraw, rescind, or correct the Warning Letter at any time and has never done so.

105. The Warning Letter was not an arrest. It required no probable cause.

106. The Capitol Police has not issued comparable Warning Letters to other citizens who criticize WEC officials.

107. Absent Plaintiff's protected speech, public-records litigation, and effort to depose Defendant Wolfe, Defendants would not have caused the Warning Letter to be drafted, would not have caused it to be served by armed officers at Plaintiff's home, would not have characterized it as a 'harassment order' in subsequent official records. Defendants do not issue comparable Warning Letters, conduct comparable armed services, or generate comparable 'harassment order' incident reports, in connection with citizens who contact, criticize, or sue WEC in the absence of an active effort to compel sworn testimony from Defendant Wolfe.

108. The pattern of conduct alleged above departs from normal law-enforcement practice in ways that have no innocent explanation. Capitol Police investigators do not, in the ordinary course of their duties, draft Warning Letters about private citizens at the request of WEC officials. DCI Special Agents do not, in the ordinary course of their duties, travel ninety miles from their assigned field office to serve a Capitol Police communication on a private citizen's home in coordination with a uniformed local officer.

109. New London municipal police officers do not, in the ordinary course of their duties, author incident reports describing non-judicial police communications as 'harassment orders.' WEC

counsel does not, in the ordinary course of their duties, deploy non-judicial police paper as discovery shields against a deposition notice. The systematic departure from each of those normal-practice baselines, in a coordinated sequence directed at the same Plaintiff in connection with the same protected litigation activity, plausibly supports the inference of an agreement.

110. Defendant Kaiser holds the title Detective Brandon K. Kaiser and, as of October 31, 2024, had served approximately seven years with the Wisconsin State Capitol Police, assigned to the Criminal Investigation Unit (CIU).

111. Defendant Kaiser's investigative role with Capitol Police is a continuing one with respect to Plaintiff.

112. The decision to issue, on Capitol Police letterhead, a written restriction on a private citizen's communications with a constitutional officeholder and her staff was not a routine clerical task.

113. It was a serious assertion of police authority with obvious legal and constitutional implications.

114. Such an action required, and in this case involved, direct command-level review and approval by Erwin.

## C. The July 7, 2023 Service Event

115. On July 7, 2023, at approximately 8:43 a.m., Defendants Roffers and Schmidt came to Plaintiff's residence at 1806 Brynnwood Trace, New London, Wisconsin.

116. Roffers verbally identified himself as a DCI Special Agent.

117. Schmidt appeared under color of state law as a New London law-enforcement officer.

118. The combined presence of an armed state DCI agent and a uniformed local officer at Plaintiff's home conveyed that the State had formally acted against Plaintiff.

119. Plaintiff opened his front door but kept the screen door closed because he had dogs immediately behind the screen door. He slide the top part of the screen door down providing free communications.

120. Plaintiff did not physically take the paper from Roffers, due to the two dogs wanting to get out to or at the officers; Roffers left the Warning Letter on the front porch immediately outside the door.

121. Roffers personally served the Warning Letter.

122. The document Roffers served was facially not court process: it bore no judge's signature, no case caption, no court file number, and no command issued by any judicial officer.

123. Roffers therefore knew, or was deliberately indifferent to the obvious fact, that he was not serving a court order, injunction, harassment order, or other judicially authorized restraint.

124. By appearing at Plaintiff's home under color of state law as a law-enforcement officer and serving the document with another officer present, Roffers gave the Warning Letter the appearance of formal legal process and state-compelled authority that it did not lawfully possess.

125. A reasonable person in Plaintiff's position would understand the event as a command backed by the coercive power of the State.

126. Schmidt did not act as a mere bystander. Schmidt was recording the interaction.

127. By accompanying Roffers in uniform and official capacity to Plaintiff's residence for service of the Warning Letter, Schmidt contributed to the combined law-enforcement show of authority used to give the unauthorized paper the appearance of formal legal force.

**D. Defendants' Knowledge, Motive, and Coordination**

128. Defendant Wolfe knew of Plaintiff's public-records requests because she was the WEC Administrator; knew of his published criticism and litigation activity because she was its subject;

and knew of his effort to obtain her sworn deposition because she was the person whose testimony he sought.

129. Wolfe did not merely know of those activities.

130. Upon information and belief, and based on circumstantial evidence including the timing, the content-specific targeting of the Warning Letter to Plaintiff's conduct toward Wolfe and others at WEC, the absence of any independent law-enforcement event preceding the deposition notice, and WEC counsel's subsequent use of the resulting paper trail in court, Wolfe communicated information directly or indirectly to Capitol Police, DCI, WEC staff, and/or WEC counsel that initiated or materially advanced the decision to create and serve the Warning Letter.

131. Wolfe fabricated a violence narrative against Plaintiff.

132. Specifically, and on information and belief, Wolfe represented to others, in substance, that Plaintiff and his associates were going to come to WEC offices armed, including with a machine gun and other firearms, to shoot up the place and to shoot people in that office.

133. That representation was a deliberate fabrication. A complete, wholly made up lie by Wolfe.

134. Plaintiff had made no such threat, had no such plan, possessed no such weapon, and had taken no action that could reasonably be interpreted as supporting Wolfe's claim.

135. Wolfe knew at the time she made the statements that they were false, or made them with reckless disregard for their truth.

136. On information and belief, the existence and substance of Wolfe's fabricated violence narrative were disclosed to Plaintiff by then-WEC Commissioner Robert F. ("Bob") Spindell, a member of the six-member Wisconsin Elections Commission, who reported to Plaintiff what Wolfe had stated within WEC and to law enforcement.

137. Spindell is identified at this stage solely as a source of factual information regarding Wolfe's statements and is not named as a Defendant.

138. On information and belief, the persons and entities to whom Wolfe communicated her fabricated violence narrative about Plaintiff included, without limitation: (a) the Wisconsin State Capitol Police, including Defendant Brandon Kaiser and Defendant David M. Erwin; (b) the six members of the Wisconsin Elections Commission, (c) the three WEC staff attorneys then in office, namely James Witecha, Brandon Hunzicker, and Angela O'Brien Sharpe; and (d) WEC Deputy Administrator Robert Kehoe, (e) and other unknown staff employees of WEC.

139. Wolfe's fabricated violence narrative directly caused, materially contributed to, or was knowingly used to justify the law-enforcement intervention against Plaintiff that culminated in the drafting and service of the Warning Letter. Kaiser, Erwin and other unknown people conspired with Wolfe to come up with the idea to create and then serve in person the Warning Letter.

140. The narrative provided the apparent factual predicate that the Warning Letter itself never identified.

141. Without Wolfe's false report of imagined armed violence, Capitol Police would have had no asserted basis to draft a letter purporting to restrict Plaintiff's contact with WEC and Wolfe.

142. In or about the summer of 2023, in furtherance of the same fabricated violence narrative and before the Warning Letter was served, Plaintiff intended to visit WEC offices to inspect public records that Plaintiff had lawfully requested.

143. On information and belief, Defendant Brandon Kaiser, acting in concert with other Capitol Police personnel and in reliance on Wolfe's false communications, formulated a plan to confront and, if circumstances permitted, to arrest Plaintiff upon his arrival at WEC.

144. Plaintiff learned of that plan through a source within WEC and, in order to avoid an unjustified law-enforcement confrontation, changed his plans and did not visit the WEC office on the planned date. He visit was to inspect public records, a lawful activity he was entitled to per statute 19.34(1),(2).

145. On information and belief, Wolfe communicated the same false narrative to the six Commissioners, the WisDOJ and to Capitol Police including Defendants Kaiser, Erwin, that caused or contributed to the formulation of that planned arrest.

146. The May 15, 2023 communication gave Wolfe and WEC actual notice that Plaintiff was challenging both the alleged fabricated violence narrative and the National Form registration pathway. The Warning Letter that followed on July 7, 2023, therefore did not arise in a vacuum. It followed Plaintiff's direct written accusation that Wolfe had spread a false violence narrative and Plaintiff's continued public and litigation pressure concerning the National Form issue.

147. The close timing between Plaintiff's May 15, 2023 communication, Plaintiff's continuing public-records litigation and deposition efforts, and the July 7, 2023 law-enforcement service of the Warning Letter supports the plausible inference that Wolfe and WEC had motive to convert Plaintiff's election-administration criticism and public-records litigation into a law-enforcement safety issue.

148. Plaintiff does not allege, without discovery, that each law-enforcement Defendant personally received the May 15, 2023 communication. Plaintiff alleges that the communication is evidence of Wolfe's and WEC's knowledge, motive, notice, and retaliatory animus, and that Wolfe and WEC thereafter communicated the false safety narrative to Capitol Police, DCI, and/or others in a manner that caused or materially advanced the Warning Letter and related law-enforcement record trail.

149. Wolfe had personal and official motive to silence, deter, and punish Plaintiff for his protected activity because his publications and litigation exposed her conduct to public scrutiny and threatened to compel her sworn testimony.

150. The timing of the Warning Letter, issued after Plaintiff served or attempted to serve a deposition notice on Wolfe and before WEC counsel deployed the paper trail in court to oppose that deposition, supports the plausible inference that Wolfe acted to convert a litigation problem into a law-enforcement problem.

151. Even apart from initiation, Wolfe knowingly benefited from, adopted, and ratified the Warning Letter and related records when WEC counsel deployed them in Case No. 23-CV-0046 to obstruct her deposition.

152. Wolfe did not repudiate the law-enforcement intervention, disclaim the restrictions imposed in her name, or correct the false appearance that formal legal grounds existed to restrict Plaintiff's communications with her and others at WEC.

153. Wolfe's personal participation is not alleged merely from her position as WEC Administrator.

154. It is alleged from the content, timing, and use of the Warning Letter.

155. The Warning Letter was directed specifically to Plaintiff's alleged conduct toward "Meagan Wolfe and others at the Wisconsin Election Commission," even though Plaintiff had not been interviewed by Capitol Police and the Letter identified no independent law-enforcement investigation, witness statement, incident, date, location, or course of conduct.

156. The only apparent source of the Wolfe-specific subject matter was Wolfe, WEC personnel acting on her behalf, or counsel acting to protect Wolfe from deposition.

157. The Letter was then used by WEC counsel for Wolfe's direct litigation benefit, namely, to prevent or limit her sworn deposition.

158. Wolfe never disavowed the Letter, corrected the false criminalized characterization, or objected to its use in her favor.

159. Defendant Kaiser knew of Plaintiff's activities because the Warning Letter expressly addressed his conduct toward Wolfe and others at WEC.

160. Defendant Erwin knew, or in the exercise of reasonable supervisory diligence would have known, because Kaiser acted within the Capitol Police chain of command on a matter of obvious constitutional gravity.

161. Defendant Roffers knew the matter concerned Plaintiff's interactions with state officials and WEC because he was assigned to serve the Warning Letter and later submitted sworn statements in the related litigation.

162. Defendant Schmidt knew the same because he accompanied Roffers in serving the Warning Letter and later documented the event in an official incident report.

**E. Use of False or Misleading Records in Case No. 23-CV-0046**

163. After the service event, the same paper was progressively recharacterized in official records.

164. The document itself called it a "warning letter." (Ex. A.)

165. Defendant Schmidt's New London Police Department incident report (Incident No. N23003687) was authored on or about July 14, 2023.

166. A true and correct copy of Schmidt's incident report is attached as Exhibit B.

167. Schmidt's incident report described the Warning Letter as a "harassment order." (Ex. B.)

168. Defendant Roffers filed a First Affidavit in Case No. 23-CV-0046 (Doc. 86). A true and correct copy of Roffers's First Affidavit is attached as Exhibit C.

169. In his First Affidavit, Roffers described the Warning Letter as a "stalking warning letter drafted by the Wisconsin State Capitol Police."

170. Roffers attached Schmidt's incident report as Exhibit B to his First Affidavit. (Ex. C.)

171. Each of those characterizations was materially false or misleading.

172. The document was not a harassment order: it was not issued by any court, was not signed by any judge, was not preceded by any hearing or probable-cause finding, and carried none of the legal attributes of a court-issued injunction, restraining order, or order for protection under Wisconsin law.

173. It was likewise not a "stalking warning letter" in any legally adjudicated sense; it contained only conditional language stating that Plaintiff's conduct "could be interpreted as stalking," and contained no judicial or administrative finding that Plaintiff had committed stalking.

174. Defendant Schmidt could not reasonably rely on the assumptions of other officers in describing the served paper as a "harassment order." The falsity of that description was apparent from the document itself (Ex. A), which on its face did not bear the attributes of any judicial order.

175. Defendant Roffers further swore under oath in Doc. 86 (Ex. C), and again in his Second Affidavit (Doc. 101) in the same case, attached as Exhibit D, that he was employed in Dane County. (Ex. D.)

176. That sworn statement was false or materially misleading.

177. Roffers's operational assignment at the relevant time was based at the DCI Fox Valley field office in the Appleton area, which is located in Outagamie County, Wisconsin, approximately ninety miles from Dane County.

178. The protected interests deprived by Defendants' fabricated records are not reputation alone. Plaintiff has been subjected to (a) an official Wisconsin State Capitol Police communication that purports to restrict his constitutionally protected communications and associations, (b) loss of his

civil-discovery right to obtain Wolfe's sworn deposition. Each of those is a harmful deprivation; independent of and in addition to the reputational harm.

179. Wisconsin voter-registration records reflect that Roffers registered to vote on April 2, 2024, at an address in the Village of Fox Crossing, in Winnebago County. (See Ex. E.)

180. Defendant Roffers further swore in paragraph 3 of Doc. 86 (Ex. C) that he "presented [his] agency-issued credentials" at Plaintiff's door on July 7, 2023.

181. That sworn statement was false.

182. Defendant Roffers did not present his agency-issued credentials at Plaintiff's door.

183. Defendant Roffers had in hand only the one-page Warning Letter.

184. Plaintiff will testify to this fact and the falsity is also apparent from the contemporaneous record of the service event. It is on video tape, recorded by Ben Schmidt.

185. Defendant Roffers's Doc. 101 second affidavit contains a further admission that undermines Defendants' position.

186. In Doc. 101, Defendant Roffers swore that he "was provided with an electronically scanned copy of [the] subpoena." That admission confirms Defendant Roffers was not physically present in Dane County to receive the subpoena, because Defendant Roffers was at his actual office at 3012 E Capital Drive, Appleton, Wisconsin 54911, in Outagamie County.

187. The notary public who notarized Defendant Roffers's affidavits, Ryan Windorff, did not legibly identify himself on the face of the notarial certificate.

188. Plaintiff was required to investigate and contact the Wisconsin Department of Financial Institutions to learn that the notary was Ryan Windorff.

189. On information and belief, Ryan Windorff is a Wisconsin government employee who works at the Wisconsin Department of Justice, Division of Criminal Investigation, at 3012 E Capital Drive, Appleton, Wisconsin 54911.

190. On information and belief, the affidavit Windorff notarized recited Dane County as the venue, although both the affiant and the notary were physically located in Outagamie County at the time of notarization.

191. On information and belief, Defendant Roffers and notary Windorff each committed unlawful acts in connection with the notarial certification of false venue.

192. Defendant Roffers further swore in Doc. 86 (Ex. C) that Plaintiff was "unwilling to physically accept the letter." That sworn statement was materially misleading because it omitted the reason Plaintiff did not open the screen door, was that he had dogs immediately behind the screen door, a fact Roffers personally observed.

193. The statement portrayed Plaintiff as defiantly noncompliant when the actual circumstance was a physical inability to safely open the door.

194. Schmidt's incident report (Ex. B) did not remain in departmental files.

195. It was transmitted to Roffers and DCI, and Roffers in turn attached it as Exhibit B to his sworn affidavit (Ex. C) filed in Case No. 23-CV-0046.

196. By that filing, Schmidt's materially false "harassment order" characterization was placed directly before the state court as part of the evidentiary record on WEC's motion for a protective order. Schmidt falsely created a new title for the Warning Letter, now it was a "harassment order". When no such order ever existed.

197. Roffer, Erwin nor any other Defendant ever corrected Defendant Ben Schmidt's lie of the Warning Letter being a "harassment order".

198. Counsel for WEC, including attorney Stephen C. Kilpatrick, used the Warning Letter (Ex. A), Schmidt's incident report (Ex. B), and Roffers's affidavits (Exs. C, D) in court filings to obtain a protective order shielding Wolfe from deposition and to quash or limit other discovery directed at Wolfe and Roffers. (See Ex. F (relevant WEC court filings deploying those records).)

199. Although Kilpatrick is not named as a Defendant in this action, his conduct is alleged for purposes of motive, causation, and coordination.

200. The three differing characterizations of the same paper across successive official records, "warning letter," "stalking warning letter," and "harassment order", reflect a coordinated escalation of the document's apparent legal significance.

201. Each successive description recast a non-judicial police communication in more legally authoritative terms, lending unwarranted credibility to WEC's effort to shield Wolfe from compelled testimony.

202. Ben Schmidt controls the police report he wrote; he has access to it in the department's files.

**F. Concrete and Particularized Injury; Loss of the Wolfe Deposition**

203. As a direct and proximate result of the conduct alleged in Sections B through E, Plaintiff was deprived of the opportunity to obtain the sworn deposition testimony of Meagan Wolfe in Case No. 23-CV-0046.

204. Wolfe possessed unique, first-hand knowledge concerning the existence, custody, retention, completeness, and withholding of the records at issue in that case, including emails, text messages, and communications with other government officials and law-enforcement personnel.

205. No other witness possessed the same combination of personal knowledge and institutional authority concerning the records at issue.

206. Wolfe's testimony on those matters would have been irreplaceable and non-cumulative.

207. The loss of that testimony impaired Plaintiff's ability to oppose protective-order efforts, to present evidence on summary judgment, and to prove the merits of his public-records claims.

208. The opportunity to depose Wolfe was permanently lost at a critical stage of the state-court litigation.

209. That lost testimony cannot now be reconstructed in a manner that restores the evidentiary posture Plaintiff would have occupied had the deposition occurred when noticed.

210. Substitute witnesses cannot replicate the testimony Wolfe herself would have provided. Plaintiff was seeking public records, for one example, of Wolfe's work emails. And, she was the records custodian for WEC at the time.

211. Plaintiff was further deprived of the ability to communicate with WEC officials concerning public records and public business without the coercive shadow of police-backed threats of arrest and prosecution.

212. Plaintiff was burdened in his right to associate with public officials, witnesses, and others for lawful investigative purposes.

213. He was held out in official state records as a stalking suspect without any adjudication, charge, or hearing.

214. Plaintiff is not seeking review or rejection of any Wisconsin state court ruling. Plaintiff's injury is the corruption of the evidentiary record by Defendants' deliberate creation and transmission of materially false official records before any judicial ruling. That injury is independent of any state court order and would be actionable in this Court whether or not the Waupaca County Circuit Court had granted, denied, or never ruled on WEC's motion for a protective order. The state court is not a defendant. Plaintiff seeks no order modifying, vacating, or appealing any Wisconsin state court ruling.

215. The state court's discovery rulings in Case No. 23-CV-0046 are not appealable as of right at the interlocutory stage under Wisconsin appellate practice; (b) even if appealed, no Wisconsin appellate remedy can restore the lost evidentiary posture that would have existed had Plaintiff obtained Wolfe's deposition at the time it was noticed (specific testimony degrades with time, recollection fades, supporting records may be modified or destroyed); (c) no separate state-court damages action against the law-enforcement Defendants for the fabrication of records is meaningfully available because Wisconsin's notice-of-claim statute (Wis. Stat. § 893.82) and state sovereign immunity erect substantial barriers, and the conduct is not a recognized state tort with a discrete name; and (d) the only forum in which the lost remedy can be vindicated is this Court under § 1983.

### G. The Continuing Nature of the Violation

216. The Warning Letter has never been withdrawn, rescinded, modified, or disavowed by the Wisconsin State Capitol Police, by Defendant Kaiser, by Defendant Erwin, or by any other person or agency with authority over it.

217. As of the date of this Amended Complaint, the Warning Letter remains in full force and effect as an official law-enforcement communication on Capitol Police letterhead.

218. It continues to threaten Plaintiff with arrest and prosecution; continues to purport to restrict his communications with Wolfe and unspecified others at WEC; and continues to order that all such contact occur only during regular business hours.

219. There is no expiration date on the Warning Letter, no administrative process by which Plaintiff can seek its withdrawal, and no tribunal before which he can challenge the restrictions it purports to impose.

220. The Warning Letter and the characterizations of it as a "harassment order" and "stalking warning letter" have been republished in news media and remain accessible online, causing continuing reputational harm.

221. Each day the Warning Letter remains outstanding and unrescinded is a new and separate injury.

### H. Wolfe's Ultra Vires Maintenance of the National Mail Voter Registration Form

222. The Wisconsin Elections Commission is a bipartisan agency created by Wis. Stat. § 5.05 and governed by a six-member Commission appointed pursuant to Wis. Stat. § 15.61(1)(a).

223. The power to prescribe the format of voter-registration forms in Wisconsin is vested by Wis. Stat. § 6.33(1) in the Commission, acting as a body, not in the Administrator acting unilaterally.

224. During Defendant Wolfe's tenure as Administrator, WEC materials and guidance represented that Wisconsin accepted the National Mail Voter Registration Form (the "National Form"), a true and correct copy of which is attached as Exhibit H, for voter registration in Wisconsin. (Ex. H). The form also lacked the mandatory Wisconsin form number in the lower left corner.

225. That representation and practice were maintained without any lawful vote of the six Commissioners prescribing the National Form for Wisconsin use under Wis. Stat. § 6.33.

226. WEC's own later admissions confirmed that the National Form had not been re-approved by WEC since its bipartisan reconstitution.

227. In September 2023, the six Commissioners themselves took formal public votes to withdraw guidance, notify clerks, and address the issue through Commission action, steps that would have been unnecessary had a prior lawful Commission prescription existed.

228. The National Form (Ex. H) materially omitted information and features required by Wisconsin's prescribed voter-registration framework, including items relating to residency, felony-status screening, and clerk-recorded information.

229. The National Form also requested information not authorized by Wisconsin statute absent rulemaking under Wis. Stat. ch. 227.

230. No lawful WEC rulemaking authorized those omissions or additions.

231. The Wisconsin state court decision in *Braun v. Wisconsin Elections Commission* confirmed the legal deficiency of the form for Wisconsin use. That Court twice directly named Meagan Wolfe for using the unlawful form. That Court named Meagan Wolfe as using the form without the Commissions' knowledge, approval, or 4 to 2 or better vote. (See Ex. G).

232. Wolfe maintained and promoted use of the deficient National Form in Wisconsin despite the absence of lawful Commission prescription and despite later direct notice of the form's legal deficiencies.

233. On information and belief, Wolfe directed WEC staff to receive and process paper voter registrations returned to a Madison post-office box used for that purpose, even though neither Wolfe nor WEC has lawful authority to function as election clerks processing voter registrations.

234. By causing or permitting continued statewide use of a form that WEC had never lawfully prescribed and that omitted mandatory Wisconsin screening requirements, Wolfe created and perpetuated an unlawful voter-registration pathway in Wisconsin elections.

235. That pathway was used on a mass basis in Wisconsin, including in the period leading up to and including the November 3, 2020 general election. And also other statewide elections, other federal elections (in 2022, 2024).

236. On information and belief, approximately 250,000 Wisconsin electors were placed on the registration rolls using the unlawful, non-prescribed National Form during the period preceding the November 3, 2020 general election.

237. On information and belief, of those approximately 250,000 unlawful-form registrants, at least 75,000 cast ballots in that November 3, 2020 election. And at least 50,000 ballots in the federal election of 2022, and at least 75,000 in the 2024 one.

238. Wolfe knew, or was deliberately indifferent to the obvious fact, that the unlawful form was not lawfully prescribed for Wisconsin use under Wis. Stat. § 6.33 and omitted Wisconsin-specific screening and recordation requirements.

239. Wolfe knew, or was deliberately indifferent to the obvious fact, that the instructions for the unlawful form were not lawfully prescribed for Wisconsin use under Wis. Stat. § 6.33 and omitted Wisconsin-specific screening and recordation requirements.

240. Wolfe nevertheless maintained, promoted, and caused WEC staff to receive and process registrations submitted on that unlawful form.

241. The fact that the WEC Commissioners themselves had to act formally in September 2023 to withdraw the practice, and the subsequent confirmation in *Braun v. Wisconsin Elections Commission* (see Ex. G) that the form was legally insufficient for Wisconsin use, further demonstrate that no lawful Commission prescription existed during Wolfe's tenure.

242. Wolfe personally approved, authorized, or directed WEC staff to represent that the unlawful form could be used in Wisconsin.

243. Wolfe personally communicated with Civitech, with CVI, on or about January 10, 2020 through October 25th, 2020 concerning the mass mailing of unlawful forms to Wisconsin residents.

244. Wolfe personally authorized or used the bulk Madison PO Box to receive these completed forms.

245. Wolfe personally directed WEC staff to accept, route, enter, upload, transmit, or process completed unlawful forms into Wisconsin's voter-registration system or to municipal clerks.

246. Wolfe did not place the unlawful form before the six Commissioners for a vote, did not disclose to the Commissioners that the form lacked required Wisconsin form features, and did not disclose that WEC lacked a record of Commission prescription under Wis. Stat. § 6.33.

247. Plaintiff is a duly registered Wisconsin elector. He cast a ballot in the 2020 General election, and in subsequent elections since both statewide and federal.

248. Plaintiff voted in person at his assigned polling location in his municipality of residence in the November 3, 2020 Wisconsin general election.

249. Plaintiff voted in that election for the Republican nominee for President of the United States, Donald J. Trump.

250. According to official results certified by the Wisconsin Elections Commission, the Democratic nominee for President, Joseph R. Biden, was declared the winner of Wisconsin's electoral votes in the November 3, 2020 general election by a certified statewide margin of approximately 20,600 votes.

251. On information and belief, a substantial majority of the at-least-75,000 unlawful-form registrants who cast ballots in that election voted for Biden, and the number of those unlawful-form votes for Biden exceeded the certified statewide margin of victory.

252. The FBI have formally opened a criminal investigation in Wisconsin into the 2020 election in particular. Upon information and belief their investigators are reviewing the Braun case, and the unlawful registration forms Meagan Wolfe directed to be used; conspiring with CVI and Civitech.

253. Plaintiff's injury is therefore not an abstract or generalized grievance.

254. It is a concrete, particularized, and historically realized injury: the candidate for whom Plaintiff cast his lawful vote lost the State of Wisconsin's electoral votes by a margin smaller than the number of ballots cast in that same election by electors who had been placed on the rolls through Wolfe's ultra vires unlawful form registration pathway.

255. Plaintiff's lawful vote was, in concrete and quantifiable terms, outweighed and effectively cancelled by ballots cast through Wolfe's unauthorized registration mechanism. Wolfe conspired with CVI, with Civitech, to target the mailings of the unlawful form to Democrat leaning people in Wisconsin.

256. Plaintiff has obtained Wisconsin voter-registration data through public-records requests. He has also obtained them via a whistleblower.

257. That data reflects mail-in registrations processed during the period in which the unlawful form was being accepted in Wisconsin, including registrations in the same municipality and county in which Plaintiff voted, and includes registrations lacking the screening and recordation features that would have appeared on the lawfully prescribed Wisconsin form but did not appear on the unlawful form. (See Ex. H; see also Ex. G.)

258. Plaintiff does not rely on candidate-standing doctrine.

259. Plaintiff alleges a voter-specific injury arising from the direct enlargement of the electorate in Plaintiff's own voting jurisdiction by a defined class of registrations placed on the rolls through an unauthorized pathway that bypassed Wisconsin's mandatory voter-registration safeguards.

260. The injury here is not speculative or undifferentiated.

261. The unlawful registration mechanism is identified and confirmed by Wisconsin appellate authority.

262. The number of unlawful-form registrants who voted exceeded the certified statewide margin of victory. In several elections including Eric Hovde's race against Tammy Baldwin in 2024. The loss was by about 28,281 votes.

263. Plaintiff cast a lawful vote for the candidate who lost that election by less than the number of unlawful-form votes. Plaintiff's right of due process was violated by Wolfe and the other defendants' actions pertaining to the unlawful instructions, and unlawful registration form, as it resulted in non-electors casting ballots in the same elections Plaintiff participated in.

264. and Wolfe personally and individually maintained the unlawful mechanism in defiance of the statutory grant of prescription authority to the Commission.

265. That injury is fairly traceable to Wolfe because Wolfe, acting without lawful Commission prescription, personally maintained and promoted the very registration mechanism that allowed those unlawful registrations to occur on a mass basis.

266. The injury is redressable through damages, declaratory relief, and other relief against Wolfe in her individual capacity.

267. Plaintiff voted in New London, Waupaca County, Wisconsin, in the November 3, 2020 election. He voted in each federal election since 2020, and most state elections. Plaintiff's public-records data identifies approximately 32,000 registrations in Plaintiff's county, 3,000 registrations in Plaintiff's municipality. His ballots for statewide and national elections went into the same bucket as those of the 250,000 unlawfully registered who voted. This was, and still is happening, for each statewide and national election.

268. Plaintiff's lawful vote was counted in an electorate enlarged from approximately N lawfully registered electors to approximately N + X electors after Defendant Wolfe caused the addition of X registrants through a non-prescribed registration pathway not available under Wisconsin law.

Plaintiff's vote was therefore reduced in relative weight from 1/N to 1/(N + X) in the same election jurisdiction and contests in which Plaintiff voted.

269. A defined class of approximately 250,000 active unlawful-form registrations, intentionally created or maintained by Wolfe, at least approximately 75,000 actual ballots cast from that class in the same statewide election(s) pool as Plaintiff's ballot, exceeding the certified margin, with continuing active registrations affecting later elections.

270. Defendant Wolfe's conduct was not a garden-variety election irregularity, clerical mistake, isolated processing error, or negligent misunderstanding of Wisconsin law. It was a deliberate, repeated, statewide operational practice implemented by the State's chief election administrator, without Commission vote, without rulemaking, without clerk authority, and through a mass-mailing and centralized processing pathway that altered the registration status of approximately 250,000 persons before a presidential election.

271. The allegations concerning the National Mail Voter Registration Form, the Madison post-office-box pathway, the approximately 250,000 registrations, and Plaintiff's May 15, 2023 communication are not pleaded solely in support of Count V. They are also independently pleaded as evidence of Plaintiff's protected speech and petitioning activity, Wolfe's and WEC's knowledge of that activity, Defendants' motive, retaliatory animus, pretext, causation, coordination, and the reason Defendants allegedly sought to deter Plaintiff's criticism, public-records litigation, and effort to obtain Wolfe's sworn deposition testimony.

# V. CAUSES OF ACTION
## COUNT I
## FIRST AMENDMENT RETALIATION
## 42 U.S.C. § 1983
## (Against Defendants Wolfe, Kaiser, Erwin, Roffers, and Schmidt)

272. Plaintiff incorporates by reference all factual allegations preceding this Count as though fully set forth herein.

273. The relevant retaliatory sequence is as follows:

(a) beginning in or before 2023, Plaintiff filed and pursued the public-records mandamus action in Waupaca County Case No. 23-CV-0046 and engaged in widely disseminated public criticism of Wolfe and WEC;

(b) in or about June 2023, Plaintiff served, attempted to serve, or otherwise initiated the process of compelling Wolfe's sworn deposition in that action

(c) Wolfe, WEC personnel, and WEC counsel received contemporaneous notice of that deposition effort

(d) within a short period thereafter, the Warning Letter (Ex. A) was drafted on Wisconsin State Capitol Police letterhead

(e) on July 7, 2023, the Warning Letter was served by an armed DCI Special Agent (Roffers) and a uniformed local officer (Schmidt) at Plaintiff's home

(f) on or about July 14, 2023, Schmidt authored Incident Report No. N23003687 (Ex. B) recharacterizing the Warning Letter as a "harassment order"

(g) on or about August 2 through August 18, 2023, Roffers filed sworn affidavits in Case No. 23-CV-0046 (Exs. C, D) attaching Schmidt's incident report and characterizing the Warning Letter as a "stalking warning letter"; and

(h) thereafter, WEC counsel deployed those records (see Ex. F) in court filings to oppose Wolfe's deposition.

274. Plaintiff engaged in conduct protected by the First Amendment, including publicly criticizing Defendant Wolfe and other public officials. Publishing commentary and investigative reporting on matters of public concern.

275. He filed and pursued public-records mandamus actions in state court.

276. He sought discovery, including the sworn deposition of Wolfe, in that action of case 046.

277. He contacted WEC to visit during ordinary business hours for lawful purposes.

278. The issuance and law-enforcement service of the Warning Letter, the threat of arrest and prosecution it contained, the creation and adoption of materially false or misleading official records describing the Warning Letter as a "harassment order" and a "stalking warning letter," and the use of those records in Case No. 23-CV-0046 to obtain protection from Wolfe's deposition each constituted adverse action that would deter a person of ordinary firmness from continuing to engage in protected activity.

279. The adverse actions were motivated, in substantial part, by Plaintiff's protected conduct, including his criticism of Wolfe, his publications, his investigation of alleged official misconduct, his public-records litigation, and his effort to compel Wolfe's sworn deposition testimony.

280. Plaintiff's protected conduct included, among other things, his May 15, 2023 written communication to Wolfe and WEC accusing Wolfe and WEC of spreading a false armed-violence narrative, demanding retraction, challenging Wolfe's alleged National Form and Madison post-office-box registration pathway, and specifically raising the alleged processing of approximately 250,000 paper voter-registration applications. That communication supplied Wolfe and WEC with actual notice of Plaintiff's protected criticism before the July 7, 2023 Warning Letter.

281. The absence of any probable cause to believe Plaintiff had engaged in conduct satisfying any element of Wis. Stat. § 940.32, in combination with the timing of the Warning Letter and its later litigation deployment, supports the inference of retaliatory motive and pretext.

282. Defendants did not identify any unprotected threat, true threat, unlawful entry, physical following, surveillance, attempted contact outside lawful public-records or litigation channels, or conduct directed at Wolfe that would satisfy the elements of Wis. Stat. § 940.32.

283. The Warning Letter instead converted protected criticism, public-records activity, and litigation-related contact into a criminalized "stalking" frame without factual particulars.

284. Upon information and belief, Defendants did not issue comparable police-delivered warning letters to other citizens who contacted WEC, criticized WEC, requested WEC records, or communicated with WEC personnel, unless those citizens had also engaged in protected activity directly threatening Wolfe's deposition or public accountability.

285. The targeted nature of the Warning Letter further supports the inference of retaliatory motive.

286. The clearly established constitutional right at issue in this Count is not framed as a general right to be free from all police warning letters.

287. It is the right not to be subjected to a police-delivered threat of arrest and prosecution, unsupported by probable cause or any identified facts satisfying the cited criminal statute, when the threat is issued because of protected criticism, public-records litigation, and an effort to obtain sworn testimony from a public official.

288. No reasonable officer, supervisor, or public official could believe it lawful to convert protected speech and petitioning activity into a baseless stalking threat in order to deter litigation and shield a public official from deposition.

289. Defendant Wolfe personally caused, initiated, encouraged, or substantially contributed to the retaliatory course of conduct alleged herein, and knowingly ratified and benefited from the resulting Warning Letter and law-enforcement record trail when they were deployed in court to shield her from compelled testimony.

290. Defendants Kaiser, Erwin, Roffers, and Schmidt each personally participated in retaliatory adverse action by, respectively, drafting and issuing the Warning Letter (Kaiser leading). Each directing, reviewing, approving, and refusing to withdraw the Warning Letter (Erwin leading). Each personally serving the Warning Letter, or causing it to be served, and submitting false or materially misleading sworn statements that placed it before the state court (Roffers leading).

291. Each authoring, or causing to be authored, an official incident report falsely characterizing the Warning Letter as a harassment order (Schmidt).

292. At all times relevant, it was clearly established that government officials may not use law-enforcement authority, threats of arrest or prosecution, or the appearance of official legal process to retaliate against a citizen for engaging in protected speech, criticism of public officials, petitioning activity, public-records activity, or participation in civil litigation.

293. No reasonable officer, supervisor, or public official in Defendants' positions could have believed the challenged conduct lawful.

294. As a direct and proximate result of Defendants' retaliatory conduct, Plaintiff suffered loss of First Amendment rights, litigation injury (including the permanent loss of Wolfe's deposition), emotional distress, reputational harm, and other compensable damages.

**COUNT II**

**BACKWARD-LOOKING DENIAL OF ACCESS TO COURTS AND PETITION
RIGHTS**
**42 U.S.C. § 1983 - First and Fourteenth Amendments**
**(Against Defendants Wolfe, Kaiser, Erwin, Roffers, and Schmidt)**

295. Plaintiff incorporates by reference all factual allegations preceding this Count as though fully set forth herein.

296. The First Amendment and the Fourteenth Amendment guarantee citizens the right to petition the government for redress of grievances and the right of meaningful access to the courts.

297. At all times relevant, Plaintiff was exercising those rights through a non-frivolous civil action in Wisconsin circuit court, Case No. 23-CV-0046, seeking judicial enforcement of Wisconsin public-records law and related relief concerning the existence, custody, retention, and production of records held by WEC.

298. Defendants allegedly manufactured and deployed a false law-enforcement safety record that foreseeably corrupted the discovery process and permanently deprived Plaintiff of material testimony needed to prove a separate public-records mandamus claim.

299. The false record trail portrayed Plaintiff as a stalking, harassment, or armed-violence threat despite the absence of judicial process, factual particulars, probable cause, hearing, or adjudication, and that portrayal materially affected Plaintiff's ability to obtain Wolfe's deposition.

300. The public-records mandamus claim in Case No. 23-CV-0046 was nonfrivolous because Plaintiff had submitted written public-records requests to WEC seeking specific categories of government records, including:

(a) emails and text messages sent or received by Wolfe concerning Plaintiff, Plaintiff's public-records requests, and Plaintiff's communications with WEC;

(b) communications between Wolfe, WEC staff, WEC counsel, Capitol Police, DCI, DOJ, or other law-enforcement personnel concerning Plaintiff

(c) records concerning the Warning Letter, alleged stalking, alleged harassment, alleged threats, or any law-enforcement referral involving Plaintiff; and

(d) records showing whether responsive communications were retained, deleted, withheld, transferred outside WEC, or communicated through non-WEC channels.

301. The deposition of Wolfe was a material and necessary component of discovery in that action.

302. Wolfe possessed unique, first-hand knowledge concerning the existence and disposition of responsive records and was the senior WEC official with personal knowledge of whether records had been communicated outside WEC, retained, deleted, destroyed, or withheld.

303. Defendants created, served, transmitted, adopted, and used a false law-enforcement safety record that portrayed Plaintiff as a stalking, harassment, or armed-violence threat without judicial process, factual particulars, probable cause, hearing, or adjudication.

304. The false record trail portrayed Plaintiff as a stalking, harassment, or armed-violence threat despite the absence of judicial process, factual particulars, probable cause, hearing, or adjudication, and that portrayal materially affected Plaintiff's ability to obtain Wolfe's deposition.

305. Wolfe's testimony was not sought for harassment, publicity, or cumulative discovery.

306. It was sought because Wolfe personally participated in or had direct supervisory knowledge of the communications and records at issue.

307. The requests included records concerning Wolfe herself.

308. The WEC staff could not testify with the same personal knowledge regarding Wolfe's own communications, devices, accounts, retention practices, or communications with law enforcement.

309. Wolfe's testimony would determine whether WEC's search, withholding, and preservation positions were truthful and complete.

310. Defendants Wolfe, Kaiser, Erwin, Roffers, Schmidt and others each took action that obstructed Plaintiff's ability to obtain Wolfe's testimony.

311. Wolfe initiated or substantially caused the law-enforcement intervention, supplied or advanced the false violence narrative, and ratified its litigation use.

312. Kaiser and Erwin authored, approved, ratified, and refused to withdraw the Warning Letter.

313. Roffers personally served the Warning Letter under color of law and participated in the inter-agency transmission and use of the resulting law-enforcement record trail.

314. Schmidt authored the materially false police incident report later deployed in court. Schmidt intentionally changed the wording of what the Warning Letter was, to a "harassment order". There was no order; there was no court case. Schmidt knew that yet decided to inflame the true facts.

315. Plaintiff relies on any later sworn filings by Roffers as evidence of motive, coordination, pretext, causation, and use of the record trail, not as the sole basis for Count II liability.

316. Those actions were undertaken with knowledge that the resulting intimidation, criminal characterization, and official record trail would interfere with Plaintiff's ability to obtain Wolfe's sworn testimony and pursue discovery in Case No. 23-CV-0046.

317. Defendants' conduct was a material and foreseeable cause of the loss of Wolfe's deposition.

318. Defendants did not merely create background facts; they created, transmitted, and enabled the use of the very law-enforcement record trail that WEC counsel relied upon to seek protection from Wolfe's deposition.

319. The state court's resulting discovery ruling was therefore made on a materially distorted record that falsely portrayed Plaintiff as the subject of a harassment order, stalking warning, or law-enforcement safety threat.

320. The intervening act of WEC counsel filing the records, and the state court considering them, did not break causation because that litigation use was the intended and foreseeable purpose of the record trail.

321. As a direct and proximate result, Plaintiff was deprived of the opportunity to obtain Wolfe's sworn testimony at the critical stage of the state-court litigation, that opportunity is now permanently lost, and no procedural mechanism in any pending proceeding can restore Plaintiff to the evidentiary posture he would have occupied had the deposition gone forward when noticed.

322. The injury was not merely delay, inconvenience, or dissatisfaction with a discovery ruling.

323. The loss of Wolfe's deposition materially impaired Plaintiff's ability to prove the public-records mandamus claim itself because it deprived him of the only contemporaneous sworn testimony from the WEC official with direct knowledge of the records, communications, retention practices, law-enforcement communications, and withholding decisions at issue.

324. Plaintiff pleads with the particularity the elements of the underlying claim and lost remedy.

325. The non-frivolous underlying claim was Plaintiff's Wisconsin public-records mandamus action in Waupaca County Case No. 23-CV-0046, in which Plaintiff sought a writ of mandamus and declaratory and injunctive relief requiring WEC to search for, preserve, and produce records responsive to Plaintiff's public-records requests, including emails, text messages, and communications between Wolfe and other government officials and law-enforcement personnel.

326. Wolfe's sworn deposition testimony was necessary to establish the existence, custody, location, retention, deletion, transmission, withholding, and completeness of those records,

including records concerning Wolfe personally, records communicated outside WEC, and records relating to Plaintiff himself.

327. The underlying mandamus claim was legally and factually nonfrivolous because Plaintiff alleged that WEC was an "authority" subject to Wisconsin's public-records law.

328. Plaintiff made written requests for identifiable records.

329. WEC possessed, controlled, or was required to search for responsive records.

330. WEC failed to conduct an adequate search, failed to preserve responsive records, wrongfully withheld records, or denied access in whole or in part.

331. Wis. Stat. § 19.37 authorized to Plaintiff mandamus, damages, fees, and other relief for unlawful denial or delay.

332. The remedies and litigation opportunities lost as a result of Defendants' conduct include the timely use of Wolfe's sworn testimony to oppose and defeat WEC's protective-order request, and the use of Wolfe's testimony as admissible evidence on summary judgment and at any merits hearing.

333. Those lost opportunities further include the ability to prove that additional responsive records existed, had been withheld, had been inadequately searched for, had been communicated outside WEC, or had been deleted or destroyed.

334. Those lost opportunities further include the ability to obtain an order compelling production of those records, and the ability to obtain statutory damages, costs, fees, and other relief available to a prevailing requester under Wis. Stat. § 19.37.

335. No later proceeding can restore that lost opportunity because the mandamus action proceeded beyond the discovery stage at which Wolfe's contemporaneous testimony could have been compelled and used, and because substitute witnesses cannot replicate Wolfe's personal

knowledge of her own communications, devices, retention decisions, law-enforcement communications, or role in the records dispute.

336. Plaintiff's loss of material evidence in a non-frivolous underlying claim, together with the loss of identifiable remedies that cannot now be obtained in any other proceeding, constitutes a backward-looking denial of access to courts cognizable under Harbury and Seventh Circuit precedent.

337. Plaintiff suffered the litigation injuries, reputational harm, and constitutional deprivations described herein.

338. The damages sought in this Count are not a substitute for ordinary appellate review of a discovery order and do not ask this Court to overturn the state court's rulings.

339. They seek damages for Defendants' independent constitutional misconduct in corrupting the evidentiary record and causing the permanent loss of material testimony needed to prove a separate, nonfrivolous mandamus claim.

### COUNT III
### DUE PROCESS DEPRIVATION THROUGH DELIBERATE FABRICATION AND TRANSMISSION OF FALSE OFFICIAL RECORDS
### 42 U.S.C. § 1983 - Fourteenth Amendment
### Against Defendants Kaiser, Erwin, Roffers, and Schmidt

340. Plaintiff incorporates by reference all factual allegations preceding this Count as though fully set forth herein.

341. This Count is asserted only as to Defendants' pre-litigation and non-testimonial conduct: the creation, adoption, authentication, inter-agency transmission, and foreseeable litigation use of materially false or misleading official records before and outside any in-court testimony.

342. Plaintiff does not assert this Count for damages based on truthful, accurate, sworn courtroom testimony.

343. The Fourteenth Amendment is violated when a state actor deliberately fabricates evidence or creates and transmits materially false official records that corrupt a judicial process and cause deprivation of a legally cognizable interest.

344. Pretrial fabrication of evidence is not immunized merely because the fabricated evidence is later introduced through testimony or court filings.

345. The legally cognizable interests deprived by Defendants' fabricated official records were not reputational harm alone.

346. Defendants' records altered Plaintiff's legal and litigation position by causing him to be treated in an active judicial proceeding as the subject of a law-enforcement safety threat, harassment order, or stalking-related restriction when no such judicial process existed.

347. Those records materially impaired Plaintiff's protected right of meaningful court access, his ability to obtain material discovery in Case No. 23-CV-0046, his ability to prove and obtain statutory relief in his public-records mandamus action under Wis. Stat. § 19.37, and his ability to communicate with WEC officials concerning public records without a continuing police-backed threat of arrest and prosecution.

348. Defendants Kaiser and Erwin caused the Warning Letter to be created and issued on Wisconsin State Capitol Police letterhead bearing Erwin's name as Chief, knowing or with reckless disregard for the obvious fact that the document falsely clothed itself with apparent legal compulsion and police-enforceable authority.

349. The Warning Letter invoked Wis. Stat. § 802.05(2).

350. The Warning Letter referenced unspecified administrative-code provisions.

351. The Warning Letter asserted that Plaintiff's conduct had induced serious emotional distress in Wolfe and others at WEC.

352. The Warning Letter threatened arrest and prosecution for future undefined "stalking behavior."

353. The Warning Letter identified no victim statement. It identified no witness. It identified no threat. It identified no course of conduct. It identified no dates. It identified no communications. It identified no fear-of-injury report. It identified no serious-emotional-distress documentation. It identified no investigation of Plaintiff. Its creation occurred before and outside any judicial proceeding.

354. Defendant Schmidt, in his role as a New London Police Department officer and not as a witness in any court proceeding, authored on or about July 14, 2023, an official law-enforcement record, New London Police Department Incident Report No. N23003687, describing the Warning Letter as a "harassment order." That description was materially false.

355. The Warning Letter on its face was not a court order, was not signed by a judge, was not preceded by any hearing, was not issued under any harassment-injunction statute, and bore none of the legal attributes of any judicial restraining order or order for protection under Wisconsin law.

356. Schmidt's authorship of that false official record was investigative and administrative conduct, not in-court testimony. Schmidt knew his false police report would be included with Roffer's sworn affidavit to be filed in a court of law.

357. Defendant Roffers participated in the pre-litigation adoption, authentication, inter-agency transmission, and use of materially false official records by personally serving the Warning Letter under official law-enforcement color.

358. Roffers did so by by receiving, adopting, and using Schmidt's false "harassment order" incident report.

359. Roffers did so by participating in the inter-agency handling and transmission of the record trail.

360. Roffers enabled the resulting paper trail to be used in the state-court discovery dispute.

361. The non-testimonial portions of Roffers's conduct, including service, transmission, adoption, authentication, and administrative use of the false characterizations within DCI's records system, are investigative and administrative acts, not in-court testimony.

362. The false characterizations were material.

363. A reasonable court deciding whether to allow or prohibit the deposition of a high-ranking public official would give substantial weight to official law-enforcement records suggesting that the litigant seeking the deposition was the subject of a harassment order, stalking warning, or active safety threat.

364. The false labels therefore had a natural tendency to influence the state court's discovery ruling and WEC counsel's request for protection from Wolfe's deposition.

365. Defendants knew or recklessly disregarded the falsity of the records.

366. Kaiser and Erwin knew the Warning Letter was not judicial process because they caused it to be issued from Capitol Police rather than from a court, and because it bore no judge's signature, case caption, court file number, hearing record, or statutory enforcement mechanism.

367. Schmidt knew the document was not a harassment order because the document he described was facially a Warning Letter and lacked every attribute of a court-issued harassment injunction.

368. Roffers knew the document and related report were not judicial process because he personally served the document, observed its facial contents, and participated in the inter-agency handling of the same record trail before it was used in Case No. 23-CV-0046.

369. The constitutional injury did not arise merely because Roffers later swore to facts in court.

370. The injury arose because Defendants created, adopted, authenticated, and transmitted false official law-enforcement records before the judicial filing, knowing or intending that those records would be used to alter Plaintiff's legal position in pending litigation.

371. The later filing and use of the records are pled as the foreseeable causal mechanism of the already-created false record trail, not as the protected act for which damages are sought.

372. As a direct and proximate result of Defendants' creation and pre-litigation transmission of materially false official records describing the Warning Letter as a "harassment order," "stalking warning letter," or equivalent law-enforcement safety threat, the state court's subsequent consideration of WEC's discovery motion was conducted against a deliberately corrupted factual record.

373. Plaintiff was deprived of fair adjudication of WEC's motion, was denied the opportunity to depose Wolfe, and suffered the litigation injuries, court-access injuries, reputational injuries, chilling injuries, and constitutional deprivations alleged herein.

374. Plaintiff's protected-interest deprivation under this Count satisfies the "stigma plus" requirement of *Paul v. Davis,* 424 U.S. 693 (1976), and *Wisconsin v. Constantineau,* 400 U.S. 433 (1971), as applied in the *Seventh Circuit in Doyle v. Camelot Care Centers,* 305 F.3d 603 (7th Cir. 2002), and *Hojnacki v. Klein-Acosta,* 285 F.3d 544 (7th Cir. 2002).

375. The first "plus" is the Warning Letter itself. The Warning Letter purports to restrict Plaintiff's communications with named state officials, commands him to limit contact to "regular business hours," and threatens arrest and prosecution for undefined future conduct.

376. The Warning Letter operates as an extra-judicial legal disability on Plaintiff's lawful communications with public officials, imposed under color of state law and without any judicial process, hearing, or adjudication. *Constantineau,* 400 U.S. at 437.

377. The second "plus" is the continuing official Wisconsin State Capitol Police record. That record stands today, and brands Plaintiff in state law-enforcement files as the subject of stalking-related police action without any adjudication, charge, or hearing.

378. The third "plus" is the loss of Plaintiff's statutory rights and remedies under Wis. Stat. § 19.37. Defendants' fabricated record trail caused the permanent loss of (a) Wolfe's contemporaneous sworn deposition testimony at the critical discovery stage of Case No. 23-CV-0046, (b) the corresponding ability to prove the public-records mandamus claim on a complete evidentiary record, and (c) the statutory damages, costs, and attorneys' fees available to a prevailing public-records requester under Wis. Stat. § 19.37(2).

379. The fourth "plus" is the continuing burden on Plaintiff's protected First Amendment activity. The Warning Letter's threat of arrest and prosecution chills Plaintiff's lawful contact with state officials, his lawful public-records activity, his lawful investigative reporting, and his lawful litigation activity.

380. Each of these legal disabilities is a tangible interest, distinct from reputation, that satisfies the *Paul v. Davis* "plus" requirement. None depends on or implicates any other pending proceeding involving Plaintiff.

381. Plaintiff's allegations regarding Roffers's sworn statements in Docs. 86 and 101, including the false Dane County employment statement, the characterization of the Warning Letter as a "stalking warning letter," and the "unwilling to physically accept" language, are pled in this Amended Complaint as evidence of motive, agreement, coordination, pretext, materiality, foreseeability, and causation under Counts I, II, III, and IV, and not as the basis for Count III damages liability premised on protected witness testimony.

382. Fabrication of evidence is actionable under the Fourteenth Amendment where deliberately created false evidence is used in a judicial proceeding to deprive plaintiff of a cognizable interest.

383. At all times relevant, it was clearly established that a state actor may not, before or outside in-court testimony, knowingly create, adopt, authenticate, or transmit materially false official records that corrupt judicial fact-finding, alter a litigant's legal position, or give an unauthorized executive communication the apparent force of judicial or police-enforceable process.

384. No reasonable officer in Defendants' positions could have believed the challenged pre-litigation record-creation and transmission conduct lawful.


## COUNT IV
### CIVIL CONSPIRACY UNDER 42 U.S.C. § 1983
#### (Against Defendants Wolfe, Kaiser, Erwin, Roffers, and Schmidt)

385. Plaintiff incorporates by reference all preceding paragraphs as though fully set forth herein.

386. This Count is derivative of the constitutional violations alleged in Counts I, II, and III.

387. Plaintiff does not assert conspiracy as a standalone constitutional right.

388. Plaintiff alleges that Defendants reached an agreement and committed overt acts to accomplish the First Amendment retaliation, denial of court access, and due-process deprivations alleged above.

389. Defendants' coordinated conduct included creating, serving, transmitting, adopting, and using a false law-enforcement safety record that portrayed Plaintiff as a stalking, harassment, or armed-violence threat without judicial process, factual particulars, probable cause, hearing, or adjudication.

390. Two or more Defendants reached an understanding, agreement, or meeting of the minds to use official authority and the appearance of law-enforcement process to criminalize Plaintiff's protected criticism and litigation activity, deter Plaintiff from further contact with WEC and Wolfe, create a law-enforcement safety record that could be used against Plaintiff, obstruct Plaintiff's ability to obtain Wolfe's sworn deposition testimony in Case No. 23-CV-0046, and deny Plaintiff meaningful access to the courts.

391. The agreement may be inferred from the specific sequence and interlocking conduct alleged above.

392. Wolfe supplied a false violence narrative to WEC personnel and law enforcement.

393. Before that law-enforcement sequence occurred, Plaintiff had directly accused Wolfe and WEC in writing on May 15, 2023 of spreading a false armed-violence narrative and of unlawfully administering or processing National Form registrations through a Madison post-office-box pathway. That direct written accusation is part of the circumstantial context from which agreement, motive, retaliatory purpose, and pretext may be inferred.

394. Capitol Police then drafted a Warning Letter targeted specifically to Plaintiff's conduct toward Wolfe and WEC.

395. The Warning Letter used Capitol Police letterhead but contained a DCI signature block and was served by a DCI agent with a local officer.

396. Schmidt then converted the same paper into an incident report describing it as a "harassment order."

397. Roffers then adopted, transmitted, or used that report as part of the same law-enforcement record trail.

398. WEC counsel then used that record trail for Wolfe's direct benefit to prevent or limit her deposition in Case No. 23-CV-0046.

399. Taken together, the timing, content, agency handoff, escalation of labels, and litigation use support a plausible inference of agreement rather than independent coincidence.

400. Overt acts in furtherance of the agreement included Wolfe's communication of the alleged false violence narrative to WEC personnel, Capitol Police, DCI, or others.

401. Overt acts further included Kaiser's drafting or causing the drafting of the Warning Letter on Capitol Police letterhead.

402. Overt acts further included Erwin's direction, review, approval, ratification, and continued refusal to withdraw or correct the Warning Letter, and Roffers and Schmidt's coordinated law-enforcement service of the Warning Letter at Plaintiff's home.

403. Overt acts further included Schmidt's authorship of an incident report falsely describing the Warning Letter as a "harassment order," and Roffers's pre-litigation service, adoption, authentication, inter-agency transmission, and use of the Warning Letter and Schmidt incident report as part of the law-enforcement record trail.

404. Roffers's later sworn filings are pled only as evidence of motive, coordination, pretext, causation, and foreseeable litigation use.

405. Overt acts further included the use and ratification of the resulting record trail to oppose, prevent, or limit Wolfe's deposition in Case No. 23-CV-0046.

406. These were not isolated or parallel acts.

407. Each step depended on the prior step: Wolfe's alleged false violence narrative supplied the factual predicate.

408. Kaiser and Erwin converted that predicate into an official Warning Letter.

409. Roffers and Schmidt gave the Letter coercive law-enforcement force through home service.

410. Schmidt escalated the document's legal significance by calling it a "harassment order".

411. Roffers and DCI transmitted, adopted, authenticated, or used that escalated record trail.

412. and WEC counsel then used the resulting law-enforcement materials to protect Wolfe from deposition.

413. The acts fit together as a single chain directed toward the same objectives.

414. Each Defendant acted outside the scope of any lawful authority in furtherance of this conspiracy.

415. No Defendant had authority to fabricate a violence narrative, issue or enforce an extra-judicial communication restriction, falsely characterize a warning letter as a harassment order, create or transmit materially false official records, or obstruct civil-discovery rights.

416. The conspiracy was not merely internal deliberation within a single office.

417. It involved actors from separate governmental entities and functions, including WEC, Capitol Police, DCI, and the New London Police Department.

418. In addition, the acts alleged were outside any lawful authority because no Defendant had authority to use law-enforcement power or false official records to impair Plaintiff's protected speech, petitioning, public-records activity, or litigation activity.

419. The purpose and effect of the conspiracy were to deprive Plaintiff of rights secured by the First and Fourteenth Amendments, including the rights alleged in Counts I, II, and III.

420. The conspiracy caused concrete injury because the combined acts accomplished what no single act alone could have accomplished: the alleged false violence narrative created the pretext.

421. The Warning Letter created the police-backed threat.

422. The home service gave the Letter coercive force.

423. The incident report gave the Letter false legal status.

424. The later use of the record trail impaired Plaintiff's ability to obtain Wolfe's deposition.

425. As a direct and proximate result of the conspiracy, Plaintiff suffered chilling of protected activity, loss of material testimony, impairment of the public-records mandamus case, reputational injury, emotional distress, continuing burdens on lawful communications with WEC, and the injuries described in Counts I, II, and III.

426. Each Defendant who knowingly participated in the conspiracy is liable for the constitutional injuries proximately caused by the overt acts committed in furtherance of the agreement.

427. The conspiracy impaired Plaintiff's state-court proceeding by supplying WEC counsel with an official law-enforcement record trail that could be used to portray Plaintiff as a safety threat and thereby oppose, prevent, or limit Wolfe's deposition.

**COUNT V**
**DEPRIVATION OF PROCEDURAL DUE PROCESS, EQUAL PROTECTION, AND
THE RIGHT TO VOTE THROUGH ULTRA VIRES MAINTENANCE OF A NON-
PRESCRIBED NATIONAL MAIL VOTER REGISTRATION FORM**
**42 U.S.C. § 1983; First and Fourteenth Amendments**
**(Against Defendant Wolfe Only)**

428. Plaintiff incorporates by reference the factual allegations preceding Count I as though fully set forth herein, including the factual allegations concerning Wolfe's ultra vires National Form conduct, Plaintiff's May 15, 2023 communication, and Plaintiff's ongoing elector injury.

429. This Count is asserted on two independent and alternative theories.

430. First, Plaintiff alleges that Defendant Wolfe deprived Plaintiff of procedural due process by administering a key element of Wisconsin's voter-registration system through unauthorized, ultra vires action that bypassed the procedural protections the Wisconsin Legislature built into the election-administration framework.

431. Second, and in the alternative, Plaintiff alleges that Defendant Wolfe's ultra vires conduct caused a concrete, particularized, and outcome-determinative dilution of Plaintiff's lawful vote in violation of the Equal Protection Clause.

432. The Constitutionally Protected Interests at Issue is one, the right to vote is a fundamental right protected by the First and Fourteenth Amendments to the United States Constitution. *Reynolds v. Sims,* 377 U.S. 533, 555 (1964) ("The right to vote freely for the candidate of one's choice is of the essence of a democratic society.").

433. The Equal Protection Clause prohibits a state from valuing one person's vote over another's through arbitrary or unauthorized election administration. *Bush v. Gore,* 531 U.S. 98, 104–05 (2000) (per curiam).

434. Procedural due process under the Fourteenth Amendment protects citizens against arbitrary state action that deprives them of constitutionally protected interests without adequate procedural safeguards.

435. Approximately 250,000 persons were placed on the active voter rolls through the unlawful-form pathway by Wolfe and Does; those registrants remain active; some are still casting ballots; and at least approximately 75,000 of them cast ballots in the November 3, 2020 election. At least 50,000 of them cast ballots in the November 2022 election, and the November 2024 election. In addition, tens of thousands of ballots were cast in the odd year statewide races; elections Plaintiff also participated in by casting ballots himself.

436. Plaintiff's protected interest is not the abstract right to have state officials follow procedure. Plaintiff's protected interest is his personal First and Fourteenth Amendment right to vote in an electorate constituted under the same mandatory registration qualifications and safeguards that apply to every Wisconsin elector.

437. Wisconsin's Commission-vote, public-meeting, form-prescription, clerk-processing, and rulemaking requirements are the procedural safeguards the Legislature made mandatory to protect that substantive voting interest. A discrete and legally cognizable interest in having voter-registration form prescription occur through the statutorily-mandated procedural channels the Wisconsin Legislature established.

438. That procedural-due-process interest is not a generalized desire for lawful government.

439. It is a specific entitlement created by Wis. Stat. §§ 5.05, 6.33(1), 15.61(1)(a), and ch. 227, conferring on Wisconsin electors the protection that voter-registration form prescription will be made (a) by the bipartisan six-member Commission, (b) through formal Commission action, (c) under public-meeting and recording requirements of Wis. Stat. ch. 19, and (d) subject to the

rulemaking procedures of Wis. Stat. ch. 227 (notice, comment, legislative oversight, and judicial review).

440. At all times relevant, Defendant Wolfe served as Administrator of the Wisconsin Elections Commission ("WEC") and acted under color of state law within the meaning of 42 U.S.C. § 1983.

441. Wolfe has limits on her statutory authority.

442. WEC is a bipartisan agency created by the Wisconsin Legislature under Wis. Stat. § 5.05.

443. The agency is governed by a six-member Commission appointed pursuant to Wis. Stat. § 15.61(1)(a).

444. Substantive election-administration powers, including the power to prescribe the format of voter-registration forms, are vested in the Commission as a body, not in the Administrator.

445. Wis. Stat. § 6.33(1) places the authority to prescribe voter-registration forms for use in Wisconsin in the Commission, acting as a body through formal Commission action.

446. That authority is not delegated, in whole or in part, to the Administrator.

447. Defendant Wolfe, as Administrator, possessed only such authority as was lawfully delegated to her by statute or by valid Commission action.

448. She did not possess the authority to prescribe voter-registration forms for Wisconsin use.

449. She did not possess the authority to promulgate rules or regulations governing voter-registration form content under Wis. Stat. ch. 227.

450. She did not possess the authority to direct that Wisconsin accept any non-prescribed voter-registration form for processing.

451. Defendant Wolfe carried out, committed, Ultra Vires conduct.

452. During Defendant Wolfe's tenure as Administrator and continuing through and beyond the November 3, 2020 general election, WEC materials, guidance, and operational practice

represented that Wisconsin accepted the unlawful mail voter registration form (Ex. H) for voter registration in Wisconsin.

453. No lawful Commission vote prescribed the National Form for Wisconsin use under Wis. Stat. § 6.33 during the relevant period. WEC's own subsequent admissions, and the September 2023 actions of the six Commissioners in which they took formal public votes to withdraw guidance, notify clerks, and address the issue through Commission action, confirm that no prior Commission prescription existed.

454. The National Form materially omitted information and features that the lawfully-prescribed Wisconsin voter-registration form contains, including items relating to residency, felony-status screening, and clerk-recorded information.

455. The National Form also requested information not authorized by Wisconsin statute absent rulemaking under Wis. Stat. ch. 227, and lacked the required Wisconsin form number, edition date, and lower-left-corner identifying notation that appears on the lawfully-prescribed form.

456. No lawful WEC rulemaking under Wis. Stat. ch. 227 authorized the form's omissions or its mass distribution and processing in Wisconsin.

457. The subsequent Wisconsin appellate decision in *Braun v. Wisconsin Elections Commission* (Ex. G) confirmed that the National Form was legally insufficient for Wisconsin use.

458. Defendant Wolfe, on information and belief, communicated with, met with, and exchanged emails with Civitech, a non-profit organization based in Austin, Texas, with offices including 1023 Springdale Road, Austin, Texas 78721. She met, communicated, with CVI for the same purposes.

459. Defendant Wolfe, CVI and Civitech conspired in a scheme to mail approximately one million non-prescribed, unlawful forms to Wisconsin residents through the United States Postal Service.

460. Defendant Wolfe, on information and belief, used a hidden bulk-mail receiving Post Office Box located at a United States Post Office building in Madison, Wisconsin, to receive completed unlawful forms returned by Wisconsin residents.

461. Defendant Wolfe, on information and belief, directed WEC staff employees to receive and process completed unlawful forms, although neither Wolfe nor WEC has lawful authority to function as election clerks processing voter registrations.

462. The lawful authority to process voter registrations is vested in municipal election clerks operating under statutory and administrative procedural protections.

463. Defendant Wolfe knew, or was deliberately indifferent to the obvious fact, that the unlawful form was not lawfully prescribed for Wisconsin use under Wis. Stat. § 6.33; that the form omitted Wisconsin-specific screening and recordation requirements; and that the six Commissioners had not voted to approve the use of the form.

464. Defendant Wolfe's conduct was intentional, not negligent. Wolfe knew the six Commissioners had not voted to prescribe the National Form for Wisconsin use; knew that Wisconsin law vested form-prescription authority in the Commission rather than the Administrator; knew the form lacked Wisconsin-specific mandatory features; knew WEC had not promulgated a rule authorizing the form's omissions or additions; and nevertheless maintained, promoted, and operationally implemented the pathway through WEC guidance, communications with third-party organizations, a Madison post-office-box return mechanism, and WEC staff processing or routing of completed forms.

465. By May 15, 2023, Plaintiff had directly notified Wolfe and WEC that he was challenging the National Form pathway, the Madison post-office-box processing mechanism, and the alleged processing of approximately 250,000 paper voter-registration applications. Wolfe did not retract,

correct, or disclose the challenged conduct, and the later WEC corrective action and Braun proceedings confirmed the absence of lawful Commission prescription.

466. Defendant Wolfe did not inform the six Commissioners that the form she was directing be sent to and processed for Wisconsin residents was unlawful.

467. Wolfe bypassed the procedural protections.

468. By prescribing, maintaining, and promoting the unlawful form for Wisconsin voter-registration use without Commission action, Defendant Wolfe bypassed each of the procedural protections set forth in paragraph E above.

469. She did so unilaterally and without notice to Plaintiff or to any other Wisconsin elector.

470. By directing WEC staff to receive and process unlawful form registrations without statutory authority, Defendant Wolfe further bypassed the role of municipal election clerks who are the lawful registration authority under Wisconsin law and who themselves operate under statutory and administrative procedural protections.

471. No notice, no hearing, no public comment, no legislative oversight, and no opportunity for judicial review preceded Defendant Wolfe's unilateral implementation of the unlawful form pathway.

472. The first occasions on which the procedural defects became publicly visible were (a) the litigation that produced the *Braun* decision and (b) the September 2023 corrective Commission action.

473. Both occurred after the November 3, 2020 general election in which Plaintiff voted.

474. Plaintiff's Concrete, Particularized, and Outcome-Determinative Injury.

475. Plaintiff is, and at all times relevant was, a duly registered Wisconsin elector who voted in person at his assigned polling location in his municipality of residence in the November 3, 2020 Wisconsin general election.

476. Plaintiff voted in that election for the Republican nominee for President of the United States, Donald J. Trump.

477. According to official results certified by the Wisconsin Elections Commission, the Democratic nominee for President, Joseph R. Biden, was declared the winner of Wisconsin's electoral votes in the November 3, 2020 general election by a certified statewide margin of approximately 20,600 votes.

478. On information and belief, approximately 250,000 Wisconsin residents were placed on the official voter-registration rolls through Defendant Wolfe's unlawful National Form pathway during the period preceding the November 3, 2020 general election.

479. Those approximately 250,000 registrants remain on the rolls as "active" registered electors as of the date of this Amended Complaint.

480. On information and belief, of those approximately 250,000 unlawful-form registrants, at least approximately 75,000 cast ballots in the November 3, 2020 Wisconsin general election.

481. On information and belief, a substantial majority of those approximately 70,000 unlawful-form votes were cast for Biden.

482. The number of unlawful-form votes cast for the candidate certified as the winner of the State of Wisconsin exceeded the certified statewide margin of victory.

483. These unlawfully registered about 250,000 people in Wisconsin continued to case illegal ballots in other elections, including the General Elections of 2022, 2024.

484. Plaintiff cast his lawful ballot in that same election for the candidate who lost the State by less than the number of unlawful-form votes. Where his candidate he voted for in 2024, Eric Hovde for US Senate, lost due to the illegal ballots cast by people who were not lawfully registered.

485. Plaintiff's lawful vote was therefore not diluted in the abstract; it was, in concrete and quantifiable terms, outweighed and effectively cancelled by ballots cast through Defendant Wolfe's unauthorized registration mechanism.

486. Plaintiff's public-records data does not merely identify a statewide policy disagreement. It identifies a discrete registrant class by registration source, registration date range, method of registration, mailing/processing pathway, voter-history status, active/inactive status, county, municipality, and whether the registrant voted in the same statewide and national elections in which Plaintiff voted. Plaintiff will prove through WEC and municipal voter-registration and voter-history records the number of unlawful-form registrants in Plaintiff's county, Plaintiff's municipality, and the statewide election contests in which Plaintiff's ballot was counted.

487. Plaintiff was a participating voter, but he did not have equal vote weight in the elections Wolfe's actions had some 250,000 participating in the various elections from Nov 3rd 2020 and forward.

488. Plaintiff has obtained Wisconsin voter-registration data through public-records requests.

489. That data reflects mail-in registrations processed during the period in which the unlawful form was being accepted in Wisconsin, including registrations in the same municipality and county in which Plaintiff voted, and includes registrations lacking the screening and recordation features that would have appeared on the lawfully-prescribed Wisconsin form but did not appear on the unlawful form. (Ex. G; Ex. H.)

490. Plaintiff's procedural-due-process injury is a specific, identifiable deprivation of a Wisconsin-statutorily-created procedural entitlement that Plaintiff possessed as an elector who voted in the affected election.

491. Plaintiff's vote-dilution injury is non-speculative because the unlawful registration mechanism is identified and confirmed by Wisconsin appellate authority, the number of unlawful-form registrants who voted exceeded the certified statewide margin of victory, and Plaintiff cast his lawful vote for the losing candidate.

492. Plaintiff does not allege a generalized loss of confidence in Wisconsin elections, does not sue merely to compel state officials to follow the law, and does not ask this Court to adjudicate an abstract disagreement over election administration. Plaintiff alleges a personal injury to his own vote in the same statewide and national election pools in which he cast ballots. The injury arises from Defendant Wolfe's intentional creation, maintenance, and promotion of a defined, data-identifiable class of active registrations entered through a non-prescribed registration pathway that bypassed mandatory Wisconsin voter-registration safeguards.

493. Plaintiff's lawful ballot was counted in the same statewide tabulation with ballots cast by that defined class, including at least approximately 70,000 ballots cast in the November 3, 2020 election, a number exceeding the certified statewide margin of victory. With at least approximately 50,000 ballots cast in the odd year statewide races, a number exceeding many certified statewide margins of victory.

494. The injury is particularized because it affected Plaintiff's own ballot in the same election contests in which Plaintiff voted. It is concrete because it is capable of measurement by voter-registration records, voter-history records, registration-source data, and the certified statewide margin. It is not speculative because Plaintiff alleges that the unlawful-form registrations were

actually placed on the active rolls, that ballots were actually cast by members of that class, and that the number of such ballots exceeded the certified statewide margin.

495. Plaintiff's injuries are fairly traceable to Defendant Wolfe, and the others unnamed Does.

496. Wolfe personally and individually maintained, promoted, and operationally implemented the unlawful form mechanism that allowed the approximately 250,000 unlawful-form registrations to occur on a mass basis.

497. Wolfe was the central point of decision and execution within WEC for the form pathway.

498. Without Wolfe's ultra vires conduct, the unlawful registration mechanism could not have functioned at scale, and the approximately 75,000 unlawful-form votes in the November 3, 2020 general election could not have been counted alongside Plaintiff's lawful ballot.

499. Wolfe herself signed off on these elections, (2020, 2022, 2024 and state elections in odd years) as the Chief Election Officer of the State of Wisconsin. Wolfe signed the certification document for each of these elections.

500. Wolfe falsely certified those elections; elections Plaintiff participated in by himself casting a ballot.

501. The continuing active status of these registrations demonstrates the ongoing nature and severity of Plaintiff's injury and supports damages and retrospective declaratory relief against Wolfe individually. Plaintiff does not seek in this individual-capacity action to invalidate ballots, decertify any election, remove any registrant from the rolls, or obtain prospective relief against WEC or any nonparty election official.

502. Plaintiff's injuries are redressable through nominal damages, compensatory damages, punitive damages where permitted by law, retrospective declaratory relief, and other legal relief authorized by law against Defendant Wolfe in her individual capacity.

503. By the acts alleged in this Count, Defendant Wolfe, and others, under color of state law, deprived Plaintiff of procedural due process secured by the Fourteenth Amendment, of equal protection of the laws secured by the Fourteenth Amendment, and of the right to vote secured by the First and Fourteenth Amendments, all enforceable through 42 U.S.C. § 1983.

504. As a direct and proximate result of Defendant Wolfe's conduct, Plaintiff suffered constitutional injury, including denial of procedural due process, denial of equal protection of the laws, dilution and effective cancellation of his lawful vote in the November 3, 2020 general election, and the harms set forth in the Damages and Irreparable Harm section of this Amended Complaint.

## VI. DAMAGES AND CONTINUING HARM

505. As a direct and proximate result of the acts alleged herein, Plaintiff suffered loss of constitutionally protected rights; permanent loss of access to material evidence necessary to prosecute a non-frivolous public-records mandamus action; emotional distress; reputational injury (including by the republication of the Warning Letter and its mischaracterizations in news media and online sources that remain accessible); and other compensable damages.

506. Plaintiff seeks compensatory, statutory, and punitive damages in amounts to be determined at trial, together with attorneys' fees and costs pursuant to 42 U.S.C. § 1988 and any other applicable authority.

507. As a continuing consequence of Defendants' individual-capacity conduct, the false or misleading law-enforcement characterizations of Plaintiff in official records continue to chill his lawful contact with government officials, continue to burden his litigation and investigative

activity, and continue to hold him out in official records as a stalking suspect without any adjudication, charge, or hearing.

## VII. PRAYER FOR RELIEF

WHEREFORE, Plaintiff Peter Bernegger respectfully prays that this Court enter judgment in his favor and grant the following relief:

A. Nominal damages against each Defendant found liable on any Count;

B. Compensatory damages against each Defendant found liable, in an amount to be determined at trial, for constitutional injuries, litigation injuries, reputational harm, emotional distress, chilling of protected activity, vote-dilution injury as to Count V, and other compensable damages proximately caused by that Defendant's individual-capacity conduct;

C. An adjudication that each Defendant found liable on a given Count is jointly and severally liable with every other Defendant found liable on that same Count for indivisible compensatory damages proximately caused by the conduct alleged in that Count;

D. Punitive damages against each individual Defendant found liable, in an amount sufficient to punish intentional, malicious, reckless, wanton, oppressive, or callously indifferent violations of Plaintiff's federal rights and to deter similar misconduct, with amount to be proven at trial;

E. To the extent available and appropriate, a retrospective declaratory judgment that the individual-capacity acts alleged in Counts I through IV violated Plaintiff's rights under the First and Fourteenth Amendments to the United States Constitution, enforceable through 42 U.S.C. § 1983;

F.  To the extent available and appropriate, a retrospective declaratory judgment that Defendant Wolfe, acting under color of state law and in her individual capacity, maintained, approved, promoted, or implemented use of the Mail Voter Registration Form in Wisconsin during the relevant period without lawful Commission prescription or authorization, in violation of Plaintiff's rights under the First and Fourteenth Amendments, as alleged in Count V;

G.  Taxable costs, litigation expenses, and, if Plaintiff is represented by counsel or otherwise eligible, reasonable attorneys' fees, to the extent permitted by 42 U.S.C. § 1988 and other applicable law;

H.  Such further legal or declaratory relief against the individual-capacity Defendants as the Court deems just and proper; and

I. Trial by jury on all issues so triable.


## DEMAND FOR JURY TRIAL

Pursuant to Fed. R. Civ. P. 38(b), Plaintiff demands trial by jury on all issues so triable. With monetary damages amounts to be proven at trial.


Dated this 18th day of May, 2026.     Respectfully submitted,

PETER BERNEGGER, Plaintiff
1806 Brynnwood Trace
New London, Wisconsin 54961
Telephone: (920) 551-0510
Email: pmbmap123@gmail.com